Good morning. The next case on the docket is 518-0281. The court is aware of the complicated nature of this case and that several lawyers are going to argue. So I want to try to get a road map before we begin of who's doing what on the alleged side of the case. With the court's permission to discuss this with Mr. Baum, Counsel Mr. Esfandiari, and I would go first on Counsel's case planning for classroom time, but then the majority of the time for the attorneys I would yield to Mr. Esfandiari. Mr. Esfandiari? Yes. And he's for Mr. Baum and that group? Yes. And I can hear for Mr. Murphy today. I was worried about you getting here because the truck got worn out driving the fleeting St. Clair series in St. Clair County. I'm glad you got a ride. I had a lot of stress in the morning. I'm glad you got a ride. Good to see you. Okay, then begin. May it please the Court, I'm Ed Clinton, Jr. I represent Stephen Johnson. I think there's just a little road map where I'm going. I think there are really three major issues in the appeal. And I think the biggest one is the so-called propriety of the cram down order that was entered by the trial court. At least that's the biggest issue. And when you refer to the cram down order, which date are you referring to? The 2015 orders. All the 2015 orders? January and April 2015. The ones where in our view the cases of those who in our view opted out were pushed back into the main settlement fund. That's what I refer to as the cram down order. Okay. Then obviously we have the dispute between my client and the bond firm over fees. And then we have the issue of common benefit fees. But I think much of the case flows from and many of the problems come from that order. And slightly, not slightly, it's extremely confusing what the record shows with respect to the settlement. What I would point out is that Johnson brought these cases. There were initially 205 claimants. At some point in there, there's no question that the bond firm appears and some of his colleagues appear on April 15, 2012. And then on December 10, 2012, Johnson has a mediation with GlaxoSmithKline. And there's a settlement framework reached for the 205 claims. And there's a sum of money that's tentatively allocated to that, and that's $10.5 million. Shortly thereafter, David Troop, who terminates Johnson, and says he's going with the bond firm. And then we have, from my perspective, two years of back and forth on whether there was a settlement. The first, GlaxoSmithKline moved to enforce. The estate of Troop opposes it, says, no, we're not on board with this. Then Glaxo withdraws its motion. Then my client moves to compel settlement. He also moves to disqualify the bond firm. And then we reach the hearing in June 13, 2014, where the trial judge found that there was, in fact, a binding settlement. The question then becomes, what exactly was the settlement? Is it the draft settlement agreement that was circulated after the December 2012 mediation? Because if it is, then the way that claims of Mr. Troop, Mr. Valerius, they should have been handled as opt-outs. Where the main file money goes for Johnson's claimants. And they are opted out, they're on their own. And they make whatever agreement with GlaxoSmithKline they want to. If that appears to be the settlement agreement that the court's referring to, that becomes a problem. Because the clients who sign the releases, when the releases are sent out to clients, they're sent out according to that draft settlement agreement that was never signed. They're sent out with a discussion of allocations in there. Gives them two different allocations. They don't know, and it isn't disclosed to them, that Mr. Troop and Mr. Valerius are going to get a much larger chunk of settlement money. That's not disclosed to them. And would they have consented to that? I highly doubt it. So, and then, you know, this case is, that's a problem. Because I think that when you, if you look at the core problem of the case is that once the clients decide to discharge Johnson, it's their right to do so. They have every right to do that. They go their own way. They settle separately with GlaxoSmithKline. When they're all pushed back together, GlaxoSmithKline, in our view, gets a gift. Because they're, some of the money they would have had to pay out to those opt-outs is essentially charged to Johnson. That's the major issue there. Is it appropriate? Does it meet with the contract to the parties? Is that their contractual agreement? Well, I thought under the settlement agreement, only 80% had to participate, not 100%. Correct. That's right. So, you know, let's suppose that your client, as you say, had known that truth was where you get more money and decided not to accept the settlement. You still had a 20% leeway to play with. There is a leeway. Like the agreement. That's true. There's a low leeway to play with. So how are we supposed to presume what you're arguing? Well, I don't, I guess I don't understand your question. This isn't a class action. It's a math action, which is very different. Correct. So we don't, we're not bound by the same rules as we were at class. Correct. We are bound by the Illinois Rules of Professional Responsibility as far as notice. And I think that you would have to allocate, you'd have to show all the allocations. Why wasn't the truth allocation shown? Because they did not turn that settlement agreement over to my client. So they didn't, your client didn't represent them at that point. Right. But that became a separate issue. So once truth pops out and the disclosure papers are sent out where the two amounts are put in, a larger amount, $100,000, smaller amount, $25,000. No one in that group is, no one who gets those papers understands that the group is getting more money. We negotiated a separate deal. So that's the problem with informed consent. That's, you know, they say, well, we've released our claims. Yes. But if you follow, if you read the language, I don't really think the release should apply. It's really not fair to Johnson because the clients didn't, they wouldn't have seen that. They see, they see $25,000 and $100,000. They don't see there's a settlement for truth. That, you know, if everything is going forth under the usual procedure, you know, there have to have been many of these cases around the country. That settlement agreement is a standard form document. You take the money or you opt out. And that's how it works. It's just in this particular case, everything got a little confused. And, you know, GlaxoSmithKline changes positions. The case is sent to arbitration and that somehow never happened. You know, the way in which the court gets to the cram down order, I understand what the court is trying to do. It's trying to wrap this up and give the clients their money. But the way in which the court does it isn't really consistent with any of the settlement drafts that are out there. It's not really. And, again, it's my client that has to pay the, essentially pays the tab for those deductions. Can you tell me about that? Can you give me a picture of what pays the tab for the deductions? It pays the tab. If you look at page 15 and 16 of our brief, you could, Johnson says I'm entitled to 40% of the money. If you look at the deductions for this troop, Delarius, they all end up coming out of his share. He's the last one. He's the lawyer. And that's how it comes out. That's the math. That's our contention. You know, I don't dispute that he's well paid. It's just that he views it as a situation where he agreed to get 40% and he's been reduced to pay bills that really properly are owed by GlaxoSmithKline. That's how he would view that. Those are owed by GlaxoSmithKline? Troop, Delarius. Return fees or all of it? All of it. The entire settlement with Troop and Delarius? The part that I set out in the brief. I laid out. I know there's some hesitation on your part to discuss amounts. I'll do it. You know, I don't understand all the field orders and proceedings anyway. I understand that. Yeah, and there's, it's the only case I've ever had a file redacted for any sort of colored court. It's complicated stuff. Well, I don't think there's the emotion for putting all of this under seal in the lower court. Well, there's lots of that. I see everything under seal, but it's just an order. I don't see a reasoning behind it. Well, there's a lot. There's a lot of paperwork on what should be sealed and not. Oh, yeah. It's in regards to discovery. No, and then I basically took the lead from GlaxoSmithKline on that. Page 15, the GlaxoSmithKline funding under the troop agreement. The second funding, A, B, the $200,000 in malaria. Then the funding agreement, and there are a couple more. D, E, and F deal with, you know. Other issues with the bond firms, which I'll address. Where did the $750,000 reserve funds come from? It did not come from Selma. At what point in time? In 2015, I believe. That money was held by GlaxoSmithKline or its lawyers to sort out whether that common benefit fee was going to be paid. And there's extensive proceedings on that as well in both the trial court and the federal courts in the Third Circuit. Can you show me or tell me where in the record I can find the agreement, if any, between Johnson and Baum? You can't, because there wasn't one that would be our position. There's an email from Baum to Johnson. There is no response to that email in the record. There's no signed agreement between the two firms. And what there is is a testimony in the record in the hearing, in the 2018 hearing, and there's a substantial testimony in the record about what the arrangement was between the two firms. My client says there was no arrangement. Baum says to take the position that he brought the benefit of the trial in the box, that Johnson attended that meeting. Johnson's position is no. He doesn't dispute he attended the meeting. He doesn't dispute that the trial in the box was used, that the information was used, or the work that the Baum firm did with the experts. He basically disputes that there's no signed agreement from his client. That's his central point. I understand the argument there, but he has a signed agreement with his client. He sure does. And it's for 40%, and his agreement says that the client may incur other costs, including MDLCs. Yes. And he puts his general language in his attorney representation contract. He sure does. So, in your arguments, why does Baum need a signed contract with the client when your client has a signed contract? Your client can bring in a recurring attorney, or an attorney, so long as your client informs, so long as Johnson informs the client. Well, the issue is, we think that the way we read the agreement is he has a right to hire, like, local counsel. But if you share an agreement, you have to comply with the LMR rules. That's Johnson's position. And that's a big enough issue, and that certainly Baum is an experienced veteran lawyer. He should know enough to know that he has to get his signed agreement. But, yes, you're correct about the language in the Johnson fee agreement with the clients. As for, I guess, the common benefit fee, I mean, there's a lot of proceedings on this. You know, we would contend there was, I mean, I think the reason the case is filed here in the state court is to avoid paying that. One of the reasons is to avoid paying that fee and not fall into the main multi-district litigation. There's also an issue, there's some reference to it in the record, that some parts of that main federal litigation were stayed. And filing here may have been an advantage for the plaintiffs to get to go forward without the federal state hanging over their heads. And Johnson, one of his arguments is that Baum wanted to come to this case to participate so that he could get the benefit of pushing forward a discovery to, you know, to essentially, so to speak, advance the ball against GlaxoSmithKline when the main federal case is stayed because the federal judge, Judge Rubens, is trying to work with everyone to settle that case. So that's the issue. I thought that that case had been settled by the time that Baum got involved, except for maybe 40,000 cases. That's right. You're right about that. That's right. But Baum had some cases in California, at least according to your client. Yes. Baum came and invited Mr. Johnson to LA for the tool-in-the-box seminar. He sure did. He did. My client attended the seminar. But I haven't seen any hearing before the court where there's formal testimony about this relationship. Or the court has actually found a contractual relationship between them. There's no such hearing or testimony. All I see, correct me if I'm wrong, is that there's just a denial of the motion for summary judgment. Right. That Mr. Messer argued in April of 2018. That's right. There's a denial of the motion. But it really wasn't argued. Right. Nor was the motion to disqualify argued. No, that wasn't argued either. That's essentially ignored. And it's ignored by Baum as well. They don't say anything about it. Why would he be disqualified? The theory is that they put proofs of interest ahead of the other clients. He's claiming to represent everyone in this group, saying I'm going to charge a fee to everyone. But he's putting troopers doing much better than everyone else. That's the main problem with it. Troopers getting nine times the amount of money that the other claimants who got the higher amount would have gotten. So that's the trouble with it. Well, if you take that argument further, he's also getting a kickback from the NBL through the BSE. Which is essentially, I understand, over. It became the BSE. That's correct. There's a reference in the record that he has collected fees from it in the past. Right. A small amount. Nevertheless, some fees. He testified that NBL was owed this money under the pretrial orders. Yeah, and he goes, instead of just ignoring them, he willingly participates in the federal litigation. I think that's what may have led to the breach between the two men. He's more of a volunteer for the Common Benefit Fund, the PST, whatever it's called. He goes out and testifies for that. And that does lead to his client's recovery. So that's an argument. I mean, we can debate whether his response to that is that he gave truthful testimony, that he has a duty to that court. I mean, that's the argument there. You see, what I don't understand about your argument that far is, in order for you to make that argument, doesn't Mr. Johnson have to have an agreement with him? In other words, if you're claiming that he's not entitled to this because he has a conflict, the only way a conflict arises is if Mr. Johnson has an agreement. I would say that I understand a lot of your question. I think that, I don't agree. I think it's more of a, I think it's more of a, I don't dispute the agreement. There's an appearance filed. There's no agreement. It's a murky, murky state of affairs. It's not clear in the record. There's no question Baum appears. There's no question that Baum writes to Johnson and says, this is what I want to charge for this. There's no question there's testimony in the record from Baum that Johnson agreed to pay these things. And Johnson's response is that he never entered into an agreement with him. That's his response. There is no agreement. Well, if he agrees by e-mail to pay the fees, what do you call that? At least we have a meeting of the mind. There would have to be silence and acceptance here because we don't have a response from Johnson in the record. I thought you just said we did. No, we don't. The only e-mail that I saw was here. Baum writes to him and says, I want these fees. Baum writes and says, this is what I want. Johnson never responds to that. I thought Johnson responded and said, what's the PFC? Right. That's right. So there is a response. Yeah, there is a response to which he doesn't say he doesn't directly dispute it. Right. But his point is, no, I didn't agree with this. That's his point. And then he allows this man to take depositions and appear with him. He at least has the appearance of having gotten a co-counsel. No question about it. And there's no question that the Baum firm does a ton of work on the case. There's no question. They try to pull in the CEO of GlaxoSmithKline. They keep trying to take that person's deposition. They're putting a lot of heat on the GlaxoSmithKline. No doubt about it. Right. So the ethical obligation, once Mr. Johnson obtains co-counsel, is really on Mr. Johnson to obtain the consent and disclosure to his clients under the rule. I would say Baum has an obligation, too, to inquire further, to keep pushing, to threaten to quit if the agreement isn't formalized. I think Baum has to do a little more than just have e-mails, correspondence with him. Now, I'm talking about all these ethical violations that you're claiming. Right. Mr. Johnson has an agreement with his clients. Right. He obtains, theoretically, co-counsel. Correct. The burden then becomes on Mr. Johnson to disclose that to his clients. Does that apply to the rule? He has a duty to disclose it, yes, he does. And he didn't do that, either. No, he didn't. Thank you. Okay. Mr. Rankin. Here for GlaxoSmithKline. Yes, Your Honor. May it please the Court, counsel, this appeal should be dismissed as it relates to the claims against GlaxoSmithKline, or the Court's orders January 27, 2015, and March 24, 2015, should be affirmed for three independent reasons. Certainly, Your Honor. January 27, 2015, and then March 24, 2015. And those are what counsel has characterized as the, quote, crammed orders. We, of course, would disagree with that characterization. The marked order was an amended order also providing for distributions. First, the Court lacks jurisdiction to hear any claim to the question that GSK paid any additional amounts to Johnson or to the JLS and Brown v. Kline, due to the fact that these clients' claims against GSK were dismissed with prejudice in April of 2015 by stipulation, and Johnson did not appeal the dismissal orders within 30 days. Thus, their claims against GlaxoSmithKline were terminated at that time. Of course, under Rule 303, a notice of appeal must be filed with the clerk within 30 days of a final judgment, and a dismissal with prejudice is considered a final judgment as it indicates the plaintiff will not be allowed to amend the complaint, thereby terminating the litigation. The courts have also held that a dismissal with prejudice is as conclusive of the rights of parties as if the suit had been prosecuted to a final judgment adverse to the plaintiff. Contrary to Mr. Johnson's contention in his reply brief, we are not arguing that the March 24, 2015, providing for various distributions constitutes a final and appealable judgment. Instead, our argument is that the April of 2015 dismissal orders, which were entered by stipulation and with prejudice, and dismissed those claims of the JLF Bonney clients against GSK, those were the final orders. And by virtue of these dismissal orders, all claims of the JLF Bonney clients against GSK, as well as any claims of Mr. Johnson against GSK for any attorney's fees to be taken from any accounts paid to his clients, were disposed of and concluded at that time. None of these dismissal orders were appealed. And thus, the court lacks jurisdiction to consider any claims of the JLF Bonney clients or Johnson against GSK. GSK has paid its money out? Yes, Your Honor. We've made all the payments that were required by the orders of the circuit court. And as I indicated previously, we would disagree with the conviction that the orders in January of 2015 and then the amended order in March of 2015 in any way constitutes a crammed-down order. What started the process was for the initial step needed to be for Mr. Johnson to deliver the original releases to GSK under that order in January 27th of 2015. Of course, he then did that. He didn't need to do that. He then did that, and that started the process. The OIP provides the releases to us, and then we make payments to Mr. Johnson for the benefit of his clients. The cases are then dismissed with prejudice by stipulation, and then we make payments of additional attorney's fees for Mr. Johnson. So in no way is that a crammed-down order. And as counsel indicated, the releases were executed by the JLF Bonney clients and Mr. Johnson, which I think is an important factor here. And those releases bar any request for any additional payment by GSK. Those releases were delivered to us by Mr. Johnson, and the releases ended their claims against GSK, including any plans for attorney's fees. Therefore, the request that GSK pay any additional attorney's fees should also be rejected. The releases explicitly state that GSK shall have no responsibility whatsoever for the payment of claims attorney's fees. This confidential release is intended to settle, emerlease, and anon claims for attorney's fees and or costs. And that's what this appeal really is about as it relates to GSK. It's regarding Mr. Johnson's request for yet additional attorney's fees. Any claims for additional attorney's fees were expressly released in those documents. Well, I think he's talking about truth and hilarious stuff, right? Well, I think... Well, I think his argument is that he should be entitled to additional payments that he would then keep. These are not additional payments that... Well, I think his argument is that the $10.5 million that there were payments that were made to Mr. Troop and Mr. Valerius, and that the balance was then available for the remaining clients. And I think he is... No, what he's talking about is he made a deal for $10.5 million, then he went over and made another deal with Troop and Valerius, and that somehow got added into the $10.5 million as a credit, right? Well, I think... He's using his client's award for resolution. Well, I think his argument is that that's... The surcharge pass of those events then reduced his fee. Correct. It didn't reduce Mr. Troop and Valerius' fee. He was supposed to get 40% fee off of $10.5 million. Instead, he gets 40% off of $10.5 million minus Troop and Valerius, right? That's his argument. That's what I thought. At the time, he didn't represent them. At the time they settled the case with Troop and Valerius, he did not represent them. Johnson, I mean. I believe that's correct. I believe that's correct. I think he was talking about that. You agree, though, that GSK paid substantially more to get rid of those cases than they did to the other plaintiffs in Mr. Johnson's case. Well, we paid those amounts. We paid $900,000 to settle the Troop claim, and that claim had been set for trial. That was the first claim that was set for trial, and then we paid $200,000 to settle the Valerius claims. But those have been traffic cases, as I understand it. Correct. Okay. So, if I understand what he's claiming, it's 40% of the $900,000 and 40% of the $200,000. That's what he thinks he's entitled to. That's what he thinks he's entitled to. Yes, I would agree with that, Your Honor. However, he still provided the releases to us. We then made—he was taking— Johnson provided the Troop and Valerius releases? No, he provided the releases to the remaining Avani clients. Well, each release is a separate contract. Again, we're not in a class action here, we're in a mass action. Correct. So, every release for each and every client is a separate contract? Certainly. So, my question to you is, if he provided you all these individual contracts, how do you then blend that over to Troop and Valerius if he didn't even represent them at the time? I think that's correct. I think that Troop and Valerius need to be regarded as a separate issue. I think that he then agreed that he was going to settle the claims for his clients at that time no longer representing Troop and Valerius. He agreed and he gave us releases signed by his clients agreeing to settle for monies and the monies that were left over from that $10.5 million pool. And then after we made payments, pursuant to those individual contracts that we had with those persons, they then agreed to dismiss their claims with prejudice which then ends any claims they have in the case. So, let me ask you this. At the time Mr. Johnson agreed to tender those releases, had the deduction of $1.1 million already been made and an allocation made to the client based on the reduced pool of money? Yes, I do believe that. So, there was the order on January 27, 2015. That provided gross allocations, a very detailed exhibit attached to that order that provided gross allocations and then also provided how expenses would be shared including the common benefit fund that Your Honor inquired about earlier. And then after that order was entered, after knowing the allocation… You're talking January 5, 2015. January 27, I believe, Your Honor. Okay, the 27th order… That's the order that said all the claims were resolved, but the January 5th order says Johnson is to distribute funds. I wonder if the January… I'll take the word for it. January 27th is the order you're referring to? January 27th, 2015. Yes, and the court ordered a percentage be held in reserve provided you would satisfy any common benefits on the settlement in that order. Correct, Your Honor. Okay. So, I guess my question then is that the January 27, 2015 order, Mr. Johnson is told to distribute funds to his clients and then gives you the releases in order that the money can be exchanged. Right, that order provides that upon the delivery of the releases, then there's a sequence of events whereby we would make payments and we've made all the payments that we were required to make. But your argument is that because he tendered these releases, he's foreclosed from arguing about this $1.1 million. As to GSK, he and his clients have conclusively released any claims they have against GSK for any additional funds. Was 40% taken out of the $1.1 million in fees? How is that handled? I'm not sure, Your Honor. Unless the BJA has any more questions, we would be able to share our time. I understand, but I'm not letting you go until I ask my questions. Sure, absolutely. That's what I wanted to confirm. And I guarantee you we won't take it off with your time, okay? We won't. Okay, follow-up. Did GSK get to the pocket that difference? No. What happened to it? Well, it's all been paid. We paid out the $10.5 million, except for amounts that we withheld. What's 40% of the fees? Well, that would be taken out of the money that GSK would pay. So we've not benefited from that. I think that Johnson says you have benefited because instead of paying $10.5 million plus $1.1 million, I have to do my math really quick, it would have cost GSK $11.6 million, but for the fact that there was this grand down payment. Right. And we never agreed to pay more than the $10.5 million. Well, Johnson wasn't a part of the negotiations, as I understand it, between Baum and Valerius and True. That all happened with GSK kind of as a side deal because Johnson had been terminated. Well, it was separate. So we had the mediation. I see it separate. Well, we had the mediation in December of 2012. Mr. Johnson attended that mediation. And what GSK had hoped is that we had agreed upon a procedure whereby the claims of all of Mr. Johnson's clients could be resolved, including the claims of Mr. True and Mr. Valerius. And then after we had that day-long mediation with Judge Guido, there was then disagreement among the counsel for all plaintiffs as to how Mr. True's claim should be handled, and that ultimately we thought that Mr. Johnson did, in fact, have the authority to settle all of his claims, including for Mr. True. Apparently that was, in fact, not correct, and that's why we then withdrew our motion to enforce the settlement. We then had various other mediations at that point in time. Mr. Johnson no longer represented True or Valerius, and then subsequent to that meeting, the mediation, the claims of Mr. True and Mr. Valerius were then settled. In this timeline you talked about, though, the mediation with Judge Guido in 2012, that occurred or did it not occur? But it's my understanding it occurred prior to the termination by True of Johnson as his lawyer. Correct. There was a conceptual framework to settle all cases. That's what we did. To enforce the settlement. And yet, there's a kicker in there that they only have to supply 80 percent of the releases, not 100. In the Draft Master Settlement Agreement, which was not signed and was not, in fact, the agreement. But that's what you paid for some of it. We were not going to pay any more than the 10.5. Right. But as the specific terms, the proposed Master Settlement Agreement was never signed, and the circuit court never said that the clauses within the Master Settlement Agreement were the agreement. So I agree with you, and I certainly agree it's a complicated history, but I view this in many ways as a case where there is an agreement to settle. The plaintiffs provided releases to us. We made payments pursuant to the releases, and their cases were then dismissed with prejudice. Therefore, all claims against the estate are concluded. I understand your argument, but the reality is that now you say we have an agreement, but you withdrew your motion to enforce that agreement, saying it didn't exist. Well, I'm not saying right now that we had an agreement. It now is apparent that— How do you then claim—if you don't have an agreement, how do you claim that 10.5 was all the money you were going to pay? Well, that's our position, that we weren't—whether an agreement or not, you know, that is all we're going to pay. It's not pursuant— Well, I'm saying right now that you didn't have an agreement. That's right. And we then—but the agreement that we do have is what Mr. Johnson's client agreed to accept and what Mr. Johnson agreed to accept, and that is pursuant to the distributions in the January 2015 order. That's the agreement that we have. But he objected to that order. He did object to that order, but then he provided releases to us, and we made payments. He agreed to accept those payments, and then he agreed to dismiss his claims with prejudice. So what you're saying is, despite the fact that he may have objected, the fact that he took the money and provided the releases now foreclosed us him on those from asking for any more. Precisely. And have you received a release from troop and delivery? Yes, Your Honor. Okay. All right. All right. Thank you very much. Thank you very much. Thank you. Mr. Espanieri. Yes. Good morning. May I have you close? I'm sorry? Espanieri? Close. Okay. You're close enough, right? Yes. You were going to be last 12 minutes, and we're still going to get you back. Thank you very much, Your Honor. Although it may go a little longer. So, there's a lot unpacked, and it appears to me there's some confusion. And I think all of this confusion, frankly, is created as a result of Mr. Johnston not being honest with the farm firm who he brought in to try the cases, not being honest with his co-counsel, the Jones firm, who was the local counsel here, and not being honest with GSK. Okay. Let me just stop you just for a moment. Certainly. Would you just state your name and who you represent? I apologize. My name is... I apologize. My name is Bijan Espanieri, and I represent the Baumhadlen firm and other entities on behalf of Baumhadlen, as well as to the troop estate. Okay. And I apologize for stealing Mr. Murphy from the argument. I apologize. So, one thing that... Let me address the Baum situation first. There were some questions whether there was an agreement between the Baum firm and Johnson. There was no formal contract, and that's very normal in these cases. A lot of these situations are handshake deals where you meet each other and say, I'm working on these cases, let's work together. There was an e-mail communication that is in the record that clearly outlines what the fee split was going to be. Well, that was from Mr. Baum's perspective. Correct. Mr. Johnson does not dispute that fee split at all. In fact, when troop settled here, Mr. Johnson received what he was entitled in a fee. He actually sued. He sought to bring arbitration against our firm to receive the fees from the troop settlement, and we resolved it. So, he received his funds from the... And he won 25% or 40%? He won 25%, which was what he... It was 40% fees. Of those 40%, 75% went to the Baum firm, 25% went to Johnson, and he received that. So, the e-mail communication that said 75% of the credit cases, he agreed to... Okay. He executed on it. And he agreed with respect, I mean, on the other part. Now, there's communications back and forth, and certainly conduct speaks volumes as well. He allowed Mr. Baum brought our firm in. He gave us access to the inventory of his cases. One of our partners, Cynthia Garber, is a registered cardiac nurse as well as an attorney. She went through his full inventory of cases to determine if his trial cases were correct and noted certain issues. We took more than 20 depositions all over the country and, from what I understand, also in Europe. We were trying to obtain the deposition of the CEO. Multiple motions were filed. All of this Johnson was aware of, knew of, his counsel stands here and admits that it occurred, and yet nonetheless he says there was no agreement to proceed in a joint venture and go forward. At no point did he say he don't have authority to proceed on behalf of these cases. At no point did he object. He benefited from all the efforts that Michael Baum, Cynthia Garber, and the Baum firm brought to these proceedings. And these cases resolved as a result of our efforts. And he assured us, as well as his local counsel, the Jones firm, that his agreement with his client allowed him to bring us into the case. Now, Mr. Clinton says, well, you shouldn't have trusted Mr. Johnson and you should have double-checked the agreements and you should have stressed further. We don't have direct contact with his 205 clients. He has a fiduciary relationship and he should contact with us. We took him at his word that his agreement allowed us to be co-counsel with him. And apparently, once one reviews the agreement, it does allow him to bring in co-counsel and indeed even allow us to, you know, participate in MDS. Let me ask you this question. One of the issues is whether or not your client, Mr. Baum, was brought in for one case or all three cases. What is your position on that? Because you referenced 205 clients. Correct. That would have been the consolidated Gable, Reagan, and Meyer cases. Correct. Oh, well, you're yelling at one of the complaints. No, we were brought in and it was our understanding that we would get 75% of whatever the trial cases were and then 10% of the non-trial cases. Of all 200? Of all 200. And the reason it's simple is because the efforts of the trial cases, Your Honor, the trial dictates the settlement. Because one of the things that GSK reached a settlement in, they were trying to avoid trial, where there's the perspective of punitive damages, publicity, and all sorts of stuff. And so the trial case and the reason you press a trial forward is to try to settle your full inventory of cases. That's just not the case one-on-one. And that's what occurred here. And that's why Mr. – I have to remind Your Honor, Mr. Johnson flew from Texas, came to California to Los Angeles to an MDL meeting, solicited our involvement, and asked us to help him after he listened to the MDL and realized how far behind he was with respect to preparing these cases. These cases were trial cases. You know, that's important. There's a question of facts on because Mr. Johnson says he was invited by Mr. Baum to L.A. and Mr. Baum entered because his cases in California had stalled and that he needed more discovery, and our rules of discovery are more liberal. So there is a question of fact as to how this arose, if you will. I'm more concerned about, one, whether there was an agreement, which, you know, I think the fact that you pay 75% out on the trial court cases speaks loudly as to what was going on, right? Right. But my second concern is the fact that after Mr. Johnson is terminated by Trup and Valerius, and Trup evidently terminates on December 20th, 2012, you know, GSK pays an exorbitant amount of money to get rid of the two trial court cases, and then the court somehow consolidates all of this together. I don't understand how that can happen. Well, when the mediation occurred, obviously Baum hadn't even known about the mediation. The mediation outbreak. At the December 2012 mediation where Johnson represented the GSK according to the record, did he have authority to settle all the cases? Well, at that point he did. He did not. He never had authority from Trup. The Trups never knew that mediation was even proceeding or that a settlement occurred. That's what started this entire thing. Mr. Johnson went to a mediation a month before trial, settled the case supposedly, told GSK I have authority to settle these cases, settled the case. Now, no allocations were made. They settled for a bulk $10.5 million for all my cases. The allocation of the $100,000 and $25,000, that came later, and that was exclusively done by Mr. Johnson. GSK did not make that allocation. Mr. Johnson made that allocation after the fact. Which allocations now? You know how he mentioned that the allocations of some of his clients received $100,000 and the bulk received $25,000? That allocation, Your Honor, was made exclusively by Johnson. It was not made by GSK. What GSK did is GSK said here's a pot of $10.5 million, you have 205 clients, and there was a threshold you had to meet, and settle your cases. Now, if all the cases did not settle or people walked it out, the money would be returned back to GSK. The money would not remain in the pot. That was part of the deal with GSK, which is very common in these types of mass court settlements. The allocation was made by Johnson exclusively. You know, this raises a very serious ethical issue under Illinois rules of professional conduct. For Mr. Johnson, that's absolutely true. For any lawyer that settles these mass cases and decides to allocate long sums, $100,000, $25,000, without really looking into the facts of each particular case, as difficult as that may be. And I don't know that we have any law on that, although I expect we will after today. And I fully agree with you, Your Honor. And I fully agree. The fact is, the bulk held in front was not aware of even the settlement had occurred. But at the point the lawyer goes into remediation, GSK has to assume that they have authority. Are you saying that he has to notify everybody, including Mr. Troop, of the mediation? Johnson? If he was going to reach a settlement, yes. So what we have in the record, Your Honor, in the record, the day after the mediation, you have a declaration in the record from Mr. Johnson's assistant. I believe her name was Linda or Lisa. Last name starts with an L. And in her declaration, she even admits, I contacted the Troop family after the mediation and informed them of the case itself. And then she was asking questions about, you know, you had previously told me you would accept $200,000. Was that net or gross? And she wanted clarification. So they had settled a case, taken the trial off calendar, for a man who was on hospice care and on his deathbed, who wanted to have a stay in court before he died, and then didn't have the courtesy to tell the client, nor the Trump or Obama that, hey, we're going to mediate, we're going to settle the case. And then now he has the audacity to come to this court and say the $2.3 million that I got paid for doing virtually nothing, in terms of a living share, is not enough. And give me another $2 million. And while he's replying to counsels as if this is the money to go to the client, it's not. This money is all about the greed of one attorney. Okay. Let's stop with the adjectives. I told you, but I just wanted to make sure the record was clear. I'm going to make a little argument here, not the adjectives. Sure. I have a question. On that Trump settlement, where you indicated that there was a 75-25 split, is that settlement paperwork in the record that would show that? The split, no, Your Honor. So there's something to do with $900,000. So what is it in the record that would give us an indication that we can see as to what you're representing? Well, Mr. Johnson filed a motion for arbitration to have a share of that settlement, once he found out that there was a settlement. That was sent to mediation, after mediation and resolve, and then Mr. Johnson withdrew his motion. So the fact that he withdrew his motion is evidence that he got paid, otherwise he wouldn't be pursuing that. There's really nothing in the record that can answer Justice Moore's question. Other than the fact of that fact occurring. From that we can only presume. I mean, there's nothing that, there's some paperwork that shows the payment or an email or anything like that. In terms of, no, there's not in the record. And, you know, Mr. Johnson, in his time, had the burden of producing a record. The majority of the issues on the appeal here, as they admit, are abuse of discretion standards. And with respect to the January 2015 order, what he called the pandemic order, the March 2015 order, no record has been produced. There is no proceedings before the court. There is no motion practiced that leaks to these orders. Nothing has been produced by Mr. Johnson saying, this is what I offer to the court, this was my proposed order, and the court rejected it. All we have is the final orders. And that burden to produce a record fell on Mr. Johnson. He neglected to do so. And there's a substantial amount of case law in Illinois that said, when the appellant fails to produce an adequate record, this court must presume that the court follows the law and the findings of the Factor Act. Okay, but... I'm still worried about the conflict of interest issue, where now, in your argument, you say that there was a $200,000 allocation to Mr. Troop, and then Troop, on December 20th, shortly after this 12th mediation, fired Mr. Johnson, right? There was no allocation. Apparently, what happened is, at the outset, perhaps, Johnson had asked Mr. Troop, what are you willing to settle this case for? And if you believe this email from the... The declaration. The declaration from the assistant of Mr. Johnson, he may have, at some point, said, I want $200,000 at the earliest stage, before being subject to depositions and all that stuff, and the entire trial. When did Mr. Baum find out about the mediation? I mean, it had to have been sometime between the 12th and the 20th. I believe he found out either on the day of, found out either right when it was about to conclude, where Johnson contacted, or I believe that that afternoon or that evening, or the next day. We did not know that it was proceeding, and we were not able to get in communication with Mr. Johnson. He went right this time. Well, I saw there were several attempts, emails, long emails, actually. But my problem, I guess, when I'm asking this question is, if we have mediation where there's $10.5 million, allegedly said, put into a file, at least there's knowledge on the part of Mr. Johnson. We've got $10.5 million. Now Mr. Baum gets hired by a troop in Blair. And within that $10.5 million, they allocate $900,000 and $200,000. How did those allocations come about? That was the only negotiation that Mr. Baum represented with GXJ. Mr. Baum represented the troop family prior to the mediation. Obviously, we were co-counsel. Then the troop family fired Johnson and went exclusively with the Baum firm. But Mr. Baum also represented 203 other people, according to you. Yes, we were based upon the joint venture agreement. That is correct. So once you do that, under our rules of professional responsibility, don't you think Mr. Baum had an obligation to contact the other members and say, I'm allocating this much to these people? We didn't do it with those allocations. At that point, $900,000 was allocated as well as $200,000. Is that a conflict of interest? No, I don't believe there's a conflict of interest. The individual, in these mass tort settlements, typically the way they work, Your Honor, is each settlement. Oh, they typically work. Yeah. Each settlement, and GSA or any firm sort of manufacturing demand, as I think shown in this case with all of the sealing requests that they filed. So the settlements need to be confidential. They don't want other people to know who's getting what. I understand that. And still trying to get a little bit sometimes, depending on the expertise of the lawyer, to get more or depending on the faculty. And the lawyer determines that. The faculty and the lawyer, yes. Right. I mean, it's the lawyer's determination based on the record that the lawyer has in front of it, whether it's medical records, putting all of the things together. Right. The lawyer has to make a reasoned decision. But those decisions have to be independent. Of course. Otherwise there's a conflict of interest. Right. Now you've got $200,000 that jumps to $900,000. In a total plot of 10.5. How can that not be a conflict of interest? We have no idea of interfering with the bond firm, of getting involved, what allocation Johnson was doing with respect to his other $195,000. I'm just talking about the total pot of money. Pot of money. In general we are. You had $110 million for your two clients. Well, the trial page, no other client was subjected to a deposition. The true family owner were the Popes. They had their ins and outs of their medical records, their relationship, the kids, all of that exposed under a microscope by GSK. At least $300,000 of costs were spent. And had troops lost, they would be on the hook for those costs potentially if GSK filed a motion and said. Filing the contract. No, no, not to us, Your Honor. GSK, I've litigated against GSK in a million cases. I've won some, I've lost some. Trials that I've lost, Your Honor, GSK filed a motion to reclaim their costs. Well, in this state. As a prevailing state. We don't have that rule in this state. You're in federal court now. We're not federal. Right. But I think I understand what you're saying. What I'm saying is there's a risk that a trial plaintiff undergoes. Burdens and efforts will be undertaken. And if another client wants to obtain the same recovery, you know, that was available to them. Johnson could have told them, listen, you can reject, and we can go to trial, and we can spend another year recreating all these depositions, doing the depositions, getting all your treaters, proposing your treaters, proposing your doctors, spending all the money, in the hopes of prevailing the trial. And after all of that, you still may lose the trial. You know, that's what, in client action litigation, we give a client, a client's representative, a consensual fee for all those depositions. I don't ever think it's been $700,000. But regardless, let me ask you this question. Let's assume, hypothetically, that this court finds that the allocations to your client, and I'm talking to the lawyer here, as opposed to all the jurors. Let's assume, hypothetically, that this court finds that these allocations were made inappropriately. Just hypothetically. What do you think would be the impact on this case? What would happen to this case if it went back? I don't view them as an allocation. I view them as two cases that the bond firm represented and reached a settlement with GSK, based on the merits of the cases, and how far they have progressed, and where they were. I do not view them as an allocation. Now, the only order that I'm aware of that allows for these $1.1 million to be included in the $10.5 million is the order of March, right? The January and March, correct. January 27th and March 24th. Correct. If those orders were vacated, that would mean that the allocations, by innuendo, if nothing else, were inappropriate. Correct. Can I make two points? I want to ask a question, if you may. And I'm going to let you. I apologize, Your Honor. So much has happened, with regard to other issues, and the allotments and all that. If the 27th and 24th orders of 2015 were set aside, what do you think would be the impact on this case, General? To answer that specific question, then I would believe that Johnson would need to return the $2.3 million in fees that he's received. The bond firm, the $275,000, all the fees are still in extra. Everything would need to be basically returned. It creates significant difficulties, because about $3 million, I believe, of the funds went to lien holders. So, you know, Medicaid, Medicare, private insurance companies, who received a big bulk of this settlement, as they always do, when they assert leniency cases. I don't know how those monies are going to be retrieved. Those monies would be owed anyway, regardless of the allocations of those monies. Well, not necessarily. No, you're right. They're always going to get paid, because there's a settlement. I think it's almost impossible. The PFP money is easy. That's still with GSK. Nobody has gotten that money. I don't really care about that. It's not really a debate of ours. But the money that has been given to the plaintiffs would have to be retraced in return, and by now it's probably all spent. The lien holders, I would imagine, is impossible to reclaim. Certainly, Jonathan could be asked to return the $2.3 million that he's been paid in fees and return that to a pot to go to clients. And I assume the court can also do the same with respect to the bond firm, if it decides to do that. Okay. You have two points you want to raise. I don't want you to black out. Yes, and I blanked out right now. I didn't apologize. No, I remembered one of the points, Yonah. The $900,000 settlement was true. Jonathan cannot stand and object to that because he actually collected fees on that. He can't collect fees and then say that that settlement is not valid. Yeah, except that it was a court-ordered settlement. It really wasn't something that he agreed to. No, it wasn't. I mean, the settlement occurred between what the bond representative drew exclusively. He settled it for $900,000. He said, okay, and the retainer fee was for 40%. I mean, he objected to your conflict of interest. I think he preserved his concern. No, because he withdrew his motion. I mean, all he cared about was to get his money from that settlement. He received his money, and then he withdrew his motion. He received his full entitled share of fees from the true seller. Why is he appealing the grand battle over that? He just wants more money. What he's saying is, and this is why I think I agree with G.S. King, that he does not stand to do so. He accepted the terms of that settlement, collected a fee. He just wants more money. As I said at the beginning, I don't want to be pejorative, but it's just simply greed, Your Honor. He received, and one thing I want to point out, under 1.5, the rules of fee, I think part three of that is the court has a duty to ensure that the fee is reasonable. So if his arm, the law, felt that the fee, the 40% that Johnson was claiming was unreasonable, and that the fee should have been 33%, the court had the power to do that. Indeed, Johnson and his brief, besides the case law, the courts are permitted to reduce even contingency fees based on the facts of the case and if they're reasonable or not reasonable. The courts have the power to do that. Well, my understanding is that there was a reduction in fee taken. I picked that up in a transcript from April of 2018 where Mr. Bartholomew all of a sudden is representing the plaintiff. From what I understand, Your Honor, and I was not personally involved in a lot of the things that occurred, but from what I understand, and I understand both. Yeah, which is good, because I'm only focused on the value. I'm going to like what I can do for him. So what the court ended up doing is it took the 40% retainer fee and said, I'm going to reduce that to, I think, it's like 33%, 32%, something like that. And so that money that was left over, then, went to the plaintiff. So each plaintiff was able to receive their due allocations. No plaintiff was harmed. But the court did reduce the fee from 40%. To, yeah. But only on, I think, on the 205 cases that that occurred. I don't know if that occurred. I don't know if it occurred with respect to truth or valerious, but with respect to the non-trial cases. The court exercised its discretion. Now, the problem, Your Honor, there is nothing in the record to show that that occurred, because all of the, leading up to the January 27, 2015 order, there's nothing in the record. There's no hearings. There's no motions. There's nothing, for example, from Johnson saying, these are my arguments. This should be the allocation. Or GSB saying, no, there's nothing. So there's no evidence of all of that, I think. I don't think there's later, because this proceedings, but the orders that were entered were minimalistic at best for the quality of brainpower in this room. You know, there was no finding by the court of the contract. There was a finding by the court of a business relationship. Correct. What does that mean? I believe the court was using the joint venture finding. I didn't find it. I apologize for that. There's no writing that I could find that says, there's a contract. No hearings since April 2018, the court of proceedings. I agree with you. Judge Gleeson did not use the word contract. I think he went down the road on the joint venture, based upon the testimony of Mr. Johnson. He didn't use those words. Of business. He said a business relationship. Right. What is that? Then he made no finding in the jurisdiction of the court. He just accepted Judge Roost, the district court's order, pre-trial order 70. Is that correct? Correct. That was for the PSC. And it's not in the history of grilling. I'm sorry. No. My understanding is that Mr. Johnson never signed the voluntary agreement that's attached to that order. That order says that this agreement must be signed for that order to be valid. Correct? It is correct that Mr. Johnson, there's no record of him signing that agreement. My understanding. But it's also correct, I think, that that order says, attached to this order is the document that must be signed for this order to become effective. And I think what the Third Circuit and the district court in Pennsylvania found was, is because once Mr. Johnson brought in the bond firm, and he brought in the bond firm as attested by his local counsel, Mr. Jones, mostly in part because the bond firm had access to the MDL documents, had access to all of the expert reports, would be able to create and present this case and prepare it for trial. And the bond firm used the MDL documents and depositions and then added to it, obviously. But I'm not aware of any case law, and maybe you can help me here, that says it's simply because an MDL confers a common benefit on a state court plaintiff that the MDL can reach out and tax the state court plaintiff. That's some kind of permitting to the jurisdiction of the district court. Not aware of any case law. I don't represent the MDL. I didn't address that issue. But that's your client. The client wants payment of the common benefits on money. No, no. We don't care about that. I could care less about the common benefits. Mr. Bond didn't care about the common benefits. He was subpoenaed to testify in the MDL when this issue arose. Gave testimony. I thought that he told Judge Gleeson in April that that's what he wants. That the MDL common benefits bond should be paid. Melissa Bond was saying that it was his understanding that because he was involved in the case and he had signed the MDL PTO 70, and because now he was representing the true family as well as co-counsel with Mr. Johnson of the other 200 cases, that fairness dictated that the MDL receive the money because Mr. Bond will receive the money. Let me straighten this out so I understand this very clearly. Mr. Bond at this point does not take the position that the MDL should have received any money for the common benefits. We don't represent the MDL, Your Honor. We don't have any. All I can say is... Okay. No, that's good enough. Just factually, I'm being an honest person. He signed the PTO. He was working on the cases. He understood that these cases were going to be subject to PSC fees. If I may add one... No, no, no, no, no. I think we've gotten enough. Okay. No. Okay. Thank you very much, Your Honor. It's much more time than you want. I do, and I appreciate it, and I'm sorry if that's not going to be enough. No, we appreciate it. It's complicated. Okay, finally. Mr. Butler? I have a question. What is your position on the Common Benefit Fund? There's no jurisdiction over Johnson and his clients, and it shouldn't be paid. Well, they just agreed that they don't represent the Common Benefit Fund, and they're not taking a position on that. Right. That's correct. So why did you just leave them award money to the Common Benefit Fund? They took that position in the trial court. That's what I thought. Yes, they did. That's okay. The record speaks for itself. So that money has not been distributed yet. That's correct. And an All Risks Act request was made by the plaintiff's hearing committee. Are you aware of that? Yes. It's not clear to me, but it appears that no injunction was issued by the district court. That's absolutely right. Okay, I just wanted to clarify that. Okay, well, great. Thank you, Ron. Okay, thank you all. As I said, this is a complicated case, and if it's a matter of advisement, we'll get you an order soon. But I hope you had our best. Thank you for coming. We appreciate your help.